IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| John Vaughan, | : | Case No. 1:12 CV 325 |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
|     Defendant, | : | **RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff John Vaughan ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §

1381 (Docket No. 1).[1] Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 17). For the

reasons that follow, the Magistrate recommends the decision of the Commissioner be affirmed.

## II. PROCEDURAL BACKGROUND

---

[1] Plaintiff originally filed for both SSI and Disability Insurance Benefits ("DIB") on June 16, 2009 (Docket No. 10, p. 11 of 931). Plaintiff was insured for a Title II claim through December 31, 2002 (Docket No. 10, p. 11 of 931). As a result of amending his disability onset date, Plaintiff has conceded that he was not disabled before December 31, 2002, and is therefore not entitled to Title II benefits (Docket No. 10, p. 11 of 931). Plaintiff voluntarily withdrew his request for DIB (Docket No. 10, p. 11 of 931).

On June 18, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 10, p. 195 of 931). Plaintiff alleged a period of disability beginning May 1, 1997 (Docket No. 10, p. 198 of 931). Plaintiff's claim was denied initially on December 30, 2009 (Docket No. 10, p. 80 of 931), and upon reconsideration on May 24, 2010 (Docket No. 10, p. 90 of 931). Plaintiff thereafter filed a timely written request for a hearing on July 31, 2010 (Docket No. 10, p. 96 of 931).

On July 19, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Kendra Kleber ("ALJ Kleber") (Docket No. 10, pp. 29-71 of 931). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, p. 31 of 931). During that hearing, Plaintiff, through counsel, amended the onset date of his disability to June 11, 2009 (Docket No. 10, p. 33 of 931). ALJ Kleber found Plaintiff to have a severe combination of diabetes, residual effects of a left patellar fracture, and depression, with an onset date of June 11, 2009 (Docket No. 10, pp. 13-14 of 931).

Despite these limitations, ALJ Kleber determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision (Docket No. 10, p. 31 of 931). ALJ Kleber found Plaintiff had the residual functional capacity to perform medium work with the following exceptions:

1.    Understand, remember, and carry-out multi-step tasks
2.    Adapt to routine changes in the work environment
3.    Get along with others on a superficial basis

(Docket No. 10, p. 18 of 931). Additionally, ALJ Kleber found Plaintiff able to perform his past relevant work as a roofer (Docket No. 10, p. 20 of 931). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 21 of 931).

On February 9, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ erred in: (1) failing to find Plaintiff's visual impairment to be severe; and (2) assessing certain opinion evidence contained in the record (Docket No. 14). Defendant filed its Answer on April 20, 2012 (Docket No. 9).

### III.  FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on July 19, 2011, in Cleveland, Ohio (Docket No. 10, p. 29 of 931). Plaintiff, represented by counsel Judith Swirsky, appeared and testified (Docket No. 10, p. 29 of 931). Also present and testifying was VE Dr. Nancy Borgeson ("Dr. Borgeson") (Docket No. 10, p. 29 of 931).

#### 1.      PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a fifty-six-year old male with an eleventh grade education (Docket No. 10, p. 35 of 931). Plaintiff resides with his sister and his girlfriend (Docket No. 10, p. 43 of 931). Prior to his disability, Plaintiff worked as a roofer/roofer's helper (Docket No. 10, p. 64 of 931).

Plaintiff stated that he had been unable to work since 1997 initially because of a seizure and later because of his low blood sugar, which he described as being "all over the place" (Docket No. 10, pp. 35-36, 44 of 931). Plaintiff also asserted that he has suffered from constant knee and leg pain for the past seven years which required him to use a cane and has limited his ability to go up and down stairs, and stand or sit for long periods of time (Docket No. 10, pp. 36-37, 39 of 931). Plaintiff indicated he suffers from depression and is bothered by the fact that other people have to take care of

him (Docket No. 10, pp. 51-52 of 931). He has difficulty sleeping and stated that he cannot sleep through the night, even with sleeping pills (Docket No. 10, p. 52 of 931). Plaintiff indicated that he has difficulty comprehending what he reads, stating the information "goes in one ear and out the other" (Docket No. 10, p. 54 of 931). Plaintiff also testified that he experiences nighttime incontinence (Docket No. 10, p. 52 of 931).

With regard to his Type II diabetes, Plaintiff stated that he currently takes a variety of medication, including insulin (Docket No. 10, pp. 44-45 of 931). According to Plaintiff, this medication only helps a little (Docket No. 10, p. 45 of 931). Plaintiff indicated that he often has trouble obtaining the medication because of financial constraints, and the longest he has ever gone without medication is a couple of weeks (Docket No. 10, pp. 46-48 of 931). Plaintiff testified he was currently enrolled in programs that helped pay for these medications, but he often forgot to reapply in order to keep the financial aid flowing (Docket No. 10, p. 47 of 931). Although he initially indicated that he has no difficulty taking the medications as prescribed (Docket No. 10, p. 46 of 931), Plaintiff later testified he forgets to take his medication, takes the wrong medication, or takes too much medication as often as two times per week (Docket No. 10, pp. 47-48 of 931). Plaintiff also indicated he sometimes "improvises" with his medication doses (Docket No. 10, p. 55 of 931).

Plaintiff also testified about his leg and knee pain. Plaintiff had knee surgery in December 2007, but indicated he has suffered from constant pain in his legs for the past seven years (Docket No. 10, pp. 36, 42 of 931). He stated he can only stand for one to two minutes at a time before needing to move around (Docket No. 10, p. 37 of 931). Plaintiff initially testified that he has had to use a cane to maintain his balance everyday for the past three years because his legs give out (Docket No. 10, pp. 38-39 of 931). However, when later questioned about his most recent fall, Plaintiff indicated that he

4

was not using his cane at the time and that he has actually only used the cane "on and off" for the past three years (Docket No. 10, p. 40 of 931). Plaintiff also testified that he only sometimes uses the cane around the house (Docket No. 10, p. 41 of 931).

Plaintiff indicated his leg pain was worse on his left side, even though his right knee was the one that required surgery (Docket No. 10, p. 53 of 931). He also indicated that his left arm goes numb (Docket No. 10, pp. 53-54 of 931). Plaintiff testified that he frequently trips, which is how he gets the bruises up and down his shins (Docket No. 10, p. 59 of 931). He claims he trips because he does not feel his legs (Docket No. 10, p. 60 of 931). Plaintiff stated that he has been ordered by his doctor to always wear shoes, but admitted to not always following this order (Docket No. 10, pp. 60-61 of 931).

When asked by the ALJ if he could take care of personal needs, Plaintiff responded in the affirmative (Docket No. 10, pp. 41-44 of 931). Plaintiff indicated that he has to sit down to shower and shave, but is able to shower and dress on his own (Docket No. 10, pp. 41-44 of 931). He testified that his girlfriend and sister take care of all the household maintenance, including laundry and housecleaning, and that his girlfriend prepares all of his food (Docket No. 10, pp. 43-44 of 931). When asked if he is responsible for any of his own meals, Plaintiff testified that if his girlfriend does not prepare anything, he simply throws something in the microwave (Docket No. 10, p. 41 of 931). Plaintiff also indicated that he is able to move around the kitchen without using his cane as long as he holds onto something (Docket No. 10, p. 42 of 931). When asked what he does all day, Plaintiff stated that he just watches television (Docket No. 10, p. 44 of 931).

ALJ Kleber also questioned Plaintiff as to his visual capabilities. Plaintiff admitted that he has been prescribed glasses, but has not gotten the prescription filled because of monetary constraints (Docket No. 10, p. 43 of 931). Plaintiff also testified that he can lift, but not carry, twenty pounds,

5

given his fear of falling when walking long distances (Docket No. 10, pp. 57-58 of 931).

       2.    **VOCATIONAL EXPERT TESTIMONY**

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a roofer's helper as very heavy and unskilled, and his past work as a roofer as medium and skilled (Docket No. 10, p. 64 of 931). According to the VE, none of Plaintiff's skills would be transferable to work at a lesser level of exertion (Docket No. 10, p. 64 of 931).

ALJ Kleber then posed the following hypothetical:

> . . . imagine if you would please a hypothetical worker of the age, education and past relevant work experience of the claimant. And to be specific I mean a 53-year-old man, well, let's see. Yeah, 53, limited education, past relevant work as only in the occupations you've identified who's able to perform work that requires lifting up to 50 pounds occasionally or 25 pounds frequently, standing or walking for six hours out of eight or sitting for six hours out of eight. And let's see, he can understand, remember or carry out multi-step tasks, can adapt to routine changes in a work environment and can get along with others on a superficial basis. Now would such a person be able to perform any of the claimant's past work?

(Docket No. 10, p. 64 of 931). Taking into account these limitations, the VE testified that Plaintiff could perform the job of a roofer as it is ordinarily performed (Docket No. 10, p. 65 of 931).

ALJ Kleber then posed a second hypothetical:

> . . . imagine if you would please this same person, all the same limitations with the additional limitation that he requires use of a cane . . . in walking for greater than 50 feet and the work should involve no exposure to hazards such as unprotected heights or uncovered industrial machines. Now otherwise all the same. Would such a person be able to perform any of the claimant's past relevant work?

(Docket No. 10, p. 65 of 931). The VE testified that, because roofing is a hazardous job, the hypothetical person would not be able to perform Plaintiff's past work (Docket No. 10, p. 65 of 931). The VE testified that there was other work that such a claimant could do including: (1) hand

6

packer/packager, listed under DOT 920.587-018, for which there are approximately 208,000 positions nationally and 9,000 in the State of Ohio; (2) laundry worker, listed under DOT 361.685-018, for which there are 75,000 positions nationally and 3,100 in the State of Ohio; and (3) bench assembler, listed under DOT 706.684-022, for which there are approximately 289,000 positions nationally and 35,000 in the State of Ohio (Docket No. 10, p. 66 of 931).

On cross examination, Plaintiff's counsel added additional limitations to the ALJ's hypothetical including: (1) no ladders; (2) sit/stand option; (3) frequent bathroom breaks; and (4) poor vision (Docket No. 10, pp. 66-67 of 931). The VE indicated that, with the addition of those limitations, the claimant would not be able to sustain full-time work (Docket No. 10, p. 70 of 931).

## B.    MEDICAL RECORDS

Plaintiff's medical records regarding his diabetes date back to January 2, 2000, when he was admitted to the University Hospital of Cleveland for five days after suffering from diabetic ketoacidosis ("DKA") (Docket No. 10, p 680 of 931). On September 15, 2001, Plaintiff presented to the MetroHealth Medical Center Emergency Room in a diabetic emergency (Docket No. 10, p. 320 of 931). Plaintiff admitted to smoking one pack of cigarettes per day and to being non-compliant with his medications (Docket No. 10, p. 317 of 931). Plaintiff was admitted to the hospital for three days and started on an insulin drip (Docket No. 10, p. 316 of 931)

Plaintiff also presented to the Bedford Medical Center ("Bedford") on numerous occasions, beginning on May 27, 1997 (Docket No. 10, p. 496 of 931). Plaintiff was diagnosed with alcoholic cirrhosis hepatitis, but declined detox (Docket No. 10, pp. 496, 498 of 931). Plaintiff claimed to have stopped smoking three days prior to this visit (Docket No. 10, p. 500 of 931). Less than one year later, on February 2, 1998, Plaintiff was seen at Bedford for a mature cataract in his left eye (Docket No. 10,

7

p. 414 of 931). At that time, medical records indicate that Plaintiff was again smoking one pack of cigarettes per day and had used cocaine as recently as December 1997 (Docket No. 10, p. 417 of 931). On February 16, 1998, Plaintiff had the cataract removed (Docket No. 10, p. 425 of 931).

Plaintiff was taken to Bedford on November 16, 1998, for DKA (Docket No. 10, p. 431 of 931) and again on November 2, 1999 (Docket No. 10, p. 466 of 931), December 13, 1999 (Docket No. 10, p. 467 of 931), and October 4, 2000 (Docket No. 10, p. 546 of 931), for the same issue. During an August 1999 visit, Plaintiff admitted to not having taken his insulin in the past thirty-six hours (Docket No. 10, p. 474 of 931). He was admitted to the Intensive Care Unit ("ICU") (Docket No. 10, p. 467 of 931). During his December 1999 visit, Plaintiff's blood sugars were reported to be 600 and he admitted to drinking more alcohol than usual and not following his diabetic diet (Docket No. 10, pp. 548, 556 of 931). He was again admitted to the ICU (Docket No. 10, p. 556 of 931).

Plaintiff continued to present to Bedford over the next several years. On April 22, 2002, Plaintiff went to the hospital after experiencing a grand mal seizure due to low blood sugar (Docket No. 10, p. 397 of 931). Plaintiff admitted that he was still smoking (Docket No. 10, p. 398 of 931). Plaintiff visited Bedford on November 22, 2002, complaining of diabetes-related issues (Docket No. 10, p. 887 of 931), on February 12, 2004, complaining of rhonchi and shortness of breath (Docket No. 10, pp. 346-47 of 931), on October 15, 2004, complaining of hypertension and difficulty breathing (Docket No. 10, p. 339-41 of 931), on March 22, 2005, for diabetes-related issues (Docket No. 10, p. 335 of 931), and on June 23, 2005, for a right toe abrasion (Docket No. 10, p. 330 of 931).

On December 9, 2005, Plaintiff met with Dr. James Vendeland, M.D. ("Dr. Vendeland") at the request of the Social Security Administration for an opthalmological consultative examination (Docket No. 10, p. 359 of 931). Dr. Vendeland determined that Plaintiff needed glasses and suspected he

suffered from glaucoma in both eyes as a result of his diabetes (Docket No. 10, p. 360 of 931). The doctor noted that Plaintiff was unable to do work-related activities due to his visual field defects in both eyes (Docket No. 10, p. 360 of 931).

Plaintiff returned to Bedford two times in 2006, the first time on January 6, 2006, complaining of left knee pain (Docket No. 10, p. 365 of 931). It was determined that Plaintiff suffered from a fracture of his patella with a large joint effusion (Docket No. 10, p. 370 of 931). Plaintiff's left knee was drained to relieve the swelling and he was discharged with a prescription for Percocet (Docket No. 10, p. 371 of 931). Plaintiff returned to Bedford on October 30, 2006, with chest pain (Docket No. 10, p. 862 of 931). An x-ray of Plaintiff's chest revealed no definitive active disease (Docket No. 10, p. 863 of 931).

Plaintiff's medical records then jump to August 27, 2009, when Plaintiff was diagnosed with leukoplaxia of the right vocal chord, likely due to his chronic tobacco use (Docket No. 10, p. 697 of 931). Plaintiff had this lesion removed on October 28, 2009 (Docket No. 10, p. 692 of 931). On November 24, 2009, Plaintiff began seeing several physicians within the MetroHealth medical system ("MetroHealth"), including general practitioners, and hepatology,[2] podiatry, and nutrition specialists (Docket No. 10, p. 665 of 931). On March 4, 2010, Francine Cernanec, CRNP ("Ms. Cernanec") noted that Plaintiff's diabetes was still uncontrolled (Docket No. 10, p. 773 of 931). She strongly advised that Plaintiff follow a program of complete alcohol abstinence (Docket No. 10, p. 773 of 931). On April 14, 2010, Plaintiff returned for a follow-up appointment with Ms. Cernanec (Docket No. 10, p. 763 of 931). Plaintiff complained of fatigue and an inability to control his blood glucose levels (Docket No.

---

[2] Hepatology is the study of the liver and the nature and treatment of its diseases. *Dorland's Illustrated Medical Dictionary* 846 (32nd ed. 2012).

9

10, p. 763 of 931). Ms. Cernanec noted that Plaintiff's liver was enlarged and presented with mild heterogeneity (Docket No. 10, p. 764 of 931). On April 20, 2010, Plaintiff met with nutritionist Cheri Collier ("Ms. Collier"), and stated that he used to eat junk food all day (Docket No. 10, p. 760 of 931). When asked what he had eaten in the past twenty-four hours, Plaintiff stated he had eaten peanut butter and two slices of toast for breakfast, along with a Diet Pepsi, nothing for lunch, a small cheese pizza for dinner, and an entire package of graham crackers (Docket No. 10, p. 760 of 931).

On July 20, 2010, Plaintiff saw Dr. Michael Prokopius ("Dr. Prokopius") complaining of blurry vision (Docket No. 10, p. 744 of 931). Plaintiff indicated that his blurred vision got worse when his blood sugars were high (Docket No. 10, p. 745 of 931). Dr. Prokopius provided Plaintiff with a new prescription for glasses (Docket No. 10, p. 745 of 931). On July 27, 2010, Plaintiff underwent an Optical Coherence Tomography evaluation (Docket No. 10, p. 741 of 931). The test was normal for both eyes, indicating Plaintiff did not suffer from glaucoma (Docket No. 10, p. 741 of 931).

Plaintiff returned to Ms. Cernanec on September 14, 2010, complaining of diarrhea, fecal incontinency, urinary frequency, and burning (Docket No. 10, p. 738 of 931). Ms. Cernanec again noted that Plaintiff's blood glucose control was poor (Docket No. 10, p. 738 of 931). On November 23, 2010, Ms. Cernanec noted that Plaintiff was complaining of leg pain, especially at night (Docket No. 10, p. 733 of 931). Ms. Cernanec also noted that Plaintiff suffered from chronic Hepatitis C and was non-compliant with his medication and follow-up orders (Docket No. 10, p. 734 of 931). She again discussed with Plaintiff the need to optimize his blood glucose control (Docket No. 10, p. 735 of 931).

On December 23, 2010, Plaintiff met with Dr. Gaby El-Khoury ("Dr. El-Khoury") (Docket No. 10, p. 728 of 931). Plaintiff complained of numbness and tingling in both feet as well as anger outbursts (Docket No. 10, p. 730 of 931). On January 7, 2011, Plaintiff returned to Ms. Cernanec

10

complaining of diarrhea and constipation (Docket No. 10, p. 724 of 931). Ms. Cernanec noted that Plaintiff was "very non-compliant" with his medication (Docket No. 10, p. 724 of 931). She also noted that Plaintiff suffered from fatty infiltration of the liver and hepatomegaly (Docket No. 10, p. 726 of 931).

Plaintiff attended a follow-up visit with Dr. El-Khoury on February 17, 2011 (Docket No. 10, p. 718 of 931). Plaintiff was still complaining of numbness in his feet and scaly skin issues (Docket No. 10, p. 718 of 931). Plaintiff also saw podiatrist Dr. Lisa Roth ("Dr. Roth") twice during this same time period and was treated for nail thickening issues (Docket No. 10, p. 720, 743 of 931).

## C.   EVALUATIONS

### 1.   INDEPENDENT MEDICAL EVALUATION

Plaintiff underwent a one-time internal medical disability examination with Dr. Wilfredo M. Paras, M.D. ("Dr. Paras") on November 1, 2005 (Docket No. 10, p. 347 of 931). Dr. Paras found Plaintiff's ability to perform work-related activities was limited by his symptoms of peripheral neuropathy, poor vision, frequent headaches, and fatigue (Docket No. 10, p. 353 of 931). Dr. Paras issued a similar opinion on September 14, 2009, noting that Plaintiff was generally limited to light work, given his peripheral neuropathy, gastro-esophageal reflux disorder, and pain in his left knee (Docket No. 10, p. 609 of 931).

### 2.   PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment with Dr. Elizabeth Das, M.D. ("Dr. Das") on March 15, 2006 (Docket No. 10, p. 591 of 931). Dr. Das found that Plaintiff had no manipulative, communicative, or environmental limitations (Docket No. 10, pp. 594-95 of 931). Dr. Das determined that Plaintiff really had no visual limitations except for his field of vision and

11

recommended that Plaintiff not engage in any commercial driving due to his diabetic retinopathy (Docket No. 10, p. 594 of 931). Dr. Das found Plaintiff to have the following exertional and postural limitations: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; (4) sit with normal breaks for a total of six hours in an eight-hour workday; and (5) never balance or climb ladders, ropes, or scaffolds (Docket No. 10, pp. 592-93 of 931).

### 3. PSYCHOLOGICAL EVALUATION

On October 2, 2009, Plaintiff underwent a psychological evaluation with Dr. J. Joseph Konieczny, Ph.D. ("Dr. Konieczny") (Docket No. 10, p. 612 of 931). During the evaluation, Plaintiff revealed that he dropped out of school after the eleventh grade and had to repeat both the first and second grades (Docket No. 10, p. 612 of 931). Plaintiff also reported a long history of drug and alcohol abuse. Plaintiff was involved in inpatient drug treatment in 1995 and last used marijuana in 2000 (Docket No. 10, p. 613 of 931). According to Plaintiff, he had not used alcohol since 1997 (Docket No. 10, p. 613 of 931). Dr. Konieczny diagnosed Plaintiff with Depressive Disorder NOS with a Global Assessment of Functioning ("GAF") score of 50 (Docket No. 10, p. 615 of 931)[3].

### 4. MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT/PSYCHIATRIC REVIEW TECHNIQUE

On November 6, 2009, Dr. Leslie Rudy, Ph.D ("Dr. Rudy") performed a Psychiatric Review Technique of Plaintiff and completed a Mental Residual Functional Capacity Assessment (Docket No. 10, pp. 627-44 of 931). Dr. Rudy diagnosed Plaintiff with Depressive Disorder NOS and found him to

---

[3] An individual's GAF score is used to gauge his overall level of functioning and ability to carry out daily activities. For purposes of summary only, a score between 41 and 50 is used to denote serious symptoms or any serious impairment in social, occupation, or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM-IV).

12

have only mild restrictions in maintaining social functioning and activities of daily living (Docket No. 10, pp. 634-41 of 931)**.** The doctor did note that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace (Docket No. 10, p. 641 of 931).

With regard to Plaintiff's Mental Residual Functional Capacity, Dr. Rudy found Plaintiff to be only moderately limited with regard to his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and work week without interruption; (5) interact appropriately with the general public; (6) accept instructions and/or respond appropriately to criticism; and (7) respond appropriately to changes in the work setting (Docket No. 10, pp. 627-28 of 931). Dr. Rudy suggested that Plaintiff work in an environment with low time and production standards (Docket No. 10, p. 629 of 931).

### 5.  SECOND PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On December 24, 2009, Plaintiff underwent a second Physical Residual Functional Capacity Assessment evaluation with Dr. W. Jerry McCloud, M.D. ("Dr. McCloud") (Docket No. 10, p. 645 of 931). Dr. McCloud determined that Plaintiff did not suffer from any postural, manipulative, visual, communicative, or environmental limitations (Docket No. 10, pp. 647-49 of 931). With regard to exertional limitations, Dr. McCloud's assessment was very similar to that of Dr. Das in 2006: (1) ability to occasionally lift and/or carry fifty pounds; (2) ability to frequently lift and/or carry twenty-five pounds; (3) stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; and (4) sit with normal breaks for a total of six hours in an eight-hour workday (Docket No. 10, p. 646 of 931). Dr. McCloud also noted that Plaintiff's diabetes was not well controlled (Docket No. 10, p. 646 of 931).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

14

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, \*16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at \*17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Kleber made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since June 11, 2009, the amended application date.

2. Plaintiff has the following severe impairments: diabetes, residual effects of a left patellar fracture, and depression.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.

15

4.     Plaintiff has the residual functional capacity to perform medium work subject to the following limitations: (1) understand, remember, and carry out multi-step tasks; (2) adapt to routine changes in the work environment; and (3) get along with others on a superficial basis.

5.     Plaintiff is capable of performing past relevant work as a roofer because this work does not require the performance of work-related activities precluded by his residual functional capacity.

6.     Plaintiff has not been under a disability, as defined in the Social Security Act, since June 11, 2009, the amended application date.

(Docket No. 10, pp. 11-21 of 931). ALJ Kleber denied Plaintiff's request for SSI benefits (Docket No. 10, p. 21 of 931).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006). In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court

16

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges: (1) there was not substantial evidence to support the ALJ's finding that Plaintiff's alleged visual impairment was not severe; and (2) the ALJ failed to properly explain the weight she assigned to the medical opinions of record (Docket No. 14).

### B.  DEFENDANT'S RESPONSE

Defendant contends that substantial evidence supports both the ALJ's finding that Plaintiff's visual impairment was not severe and her assessment of the medical opinion evidence (Docket No. 17).

### C.  DISCUSSION

The bulk of Plaintiff's argument is focused on the ALJ's alleged failure to properly weigh and set forth any reasons for rejection of Plaintiff's physician's opinions (Docket No. 14, pp. 6-11 of 11). Plaintiff makes this argument with regard to both his alleged visual impairment and residual functional capacity. For ease of understanding, this opinion will first set forth the law concerning what an ALJ must consider and/or include in his report. Each of Plaintiff's allegations will then be discussed in turn.

#### 1.  PHYSICIAN OPINION EVIDENCE

Social Security regulations set forth specific guidelines for evaluating both medical and opinion evidence. With regard to opinion evidence, the regulations "explain the significance given to medical opinions from treating sources on the nature and severity of an individual's impairment(s)." 1996 SSR LEXIS 2, *2-3 (July 2, 1996). Medical opinions are "statements from physicians and psychologists or

other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite the impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The Social Security Administration recognizes that the opinions of a claimant's treating physician(s) bear special significance and are sometimes entitled to controlling weight. 1996 SSR LEXIS 2 at *4. When discussing medical opinions, it is important to note that not all issues regarding the nature and severity of a claimant's alleged disability are *medical* issues, even those issued by a treating physician. *Id.* at *5. The Social Security Administration has reserved judgment on the following items to the Commissioner, labeling them as "administrative findings:" (1) whether a claimant's impairment(s) meet or are medically equivalent in severity to the requirements of the Listings; (2) a determination of a claimant's residual functional capacity; (3) whether the claimant's residual functional capacity prevents him from doing his past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether a claimant is "disabled" as defined under the Social Security regulations. *Id.*

That being said, opinions from *all* medical sources, even those on issues expressly reserved to the Commissioner, cannot be ignored. 1996 SSR LEXIS 2 at *6. "The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." *Id*; *see also* 20 C.F.R. §§ 404.1527(b), 416.927(b). More specific to the situation at hand, "because state agency consultants are experts in the Social Security Disability programs, the rules set forth in 20 C.F.R. §§ 404.1527(f) and 416.927(f) require an ALJ to consider the consultants' findings of fact about the nature and severity of a claimant's impairment(s) as opinions of non-examining physicians."

1996 SSR LEXIS 3, *4-5 (July 2, 1996). Thus, an ALJ is "not bound by findings made by State agency or other program physicians . . ., but [he] may not ignore these opinions and must explain the weight given to the opinions in their decision." *Id*. at *5. These opinions can be given weight, however, "only insofar as they are supported by evidence in the case record." *Id*. at *6.

However, even though an ALJ is required to consider these opinions and evaluate them according to the regulations, an ALJ is "not required to discuss or summarize every piece of evidence in the record." *Szymanski v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 117096, *22-23 (N.D. Ohio 2011). While it may be ideal for an ALJ to set forth his reasons specifically crediting or discrediting each and every submitted medical opinion of record, it is well settled in the Sixth Circuit that "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party . . . so long as his factual findings as a whole show that he implicitly resolved [any] conflict." *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999).

## 2.  VISUAL IMPAIRMENT

Plaintiff alleges the ALJ erred by failing to find Plaintiff's visual impairment to be severe (Docket No. 14, p. 6 of 11). Defendant counters that there exists substantial evidence that this alleged impairment was not severe (Docket No. 17, pp. 3-5 of 10).

To be severe, an impairment or combination of impairments must significantly limit a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1527(c), 416.920(c). An impairment qualifies as "*not* severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691 (6th Cir. 1985) (*quoting Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)

19

(emphasis added). The claimant bears the burden of proving the severity of his impairments. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Here, Plaintiff failed to show that his alleged visual impairments were severe enough to cause any more than minimal limitation on Plaintiff's ability to perform basic work activities.

Plaintiff initially filed for SSI on August 30, 2005 (Docket No. 10, p. 192 of 931). At that time, Plaintiff noted that he was having problems with both eyes, causing him to be limited in his ability to work (Docket No. 10, p. 221 of 931). Plaintiff also indicated that he needed to wear glasses, but did not because he could not afford to have the prescription filled (Docket No. 10, p. 246 of 931). On December 9, 2005, the Social Security Administration requested that Plaintiff see Dr. Vendeland for an opthalmological consultative examination (Docket No. 10, p. 359 of 931). Dr. Vendeland found Plaintiff's vision without glasses to be 20/300 in his right eye and 20/50-2 in his left (Docket No. 10, p. 359 of 931). According to the doctor, Plaintiff's "best correction" vision would improve to 20/30-1 in his right eye and 20/40 in his left (Docket No. 10, p. 359 of 931). Dr. Vendeland suspected Plaintiff suffered from glaucoma in both eyes and stated that Plaintiff was "unable to do work-related activities due to visual field defects in both eyes" (Docket No. 10, p. 360 of 931). A diagnosis of glaucoma was not confirmed at the time.

Nearly five years later, Plaintiff saw Dr. Prokopius complaining of blurry vision in each eye (Docket No. 10, p. 744 of 931). Dr. Prokopius noted that it had been twelve years since Plaintiff's last eye exam (Docket No. 10, p. 744 of 931). He issued Plaintiff a prescription for glasses and recommended Plaintiff undergo an optical coherence tomography evaluation to test for eye disease (Docket No. 10, p. 745 of 931). Plaintiff underwent this evaluation on July 27, 2010 (Docket No. 10, p. 741 of 931). The lab tests were normal for both eyes; no glaucoma was detected (Docket No. 10, p.

20

741 of 931).

Plaintiff's first Physical Residual Functional Capacity Assessment, conducted by Dr. Das, found that Plaintiff had no visual limitations except for limited field of vision (Docket No. 10, p. 594 of 931). By Plaintiff's second Physical Residual Functional Capacity Assessment, conducted on December 24, 2009, by Dr. McCloud, no visual limitations were found (Docket No. 10, p. 648 of 931).

Under Social Security regulations, disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this condition, a claimant must have an impairment severe enough that it renders him unable to do his past relevant work or any other work in the national economy. 20 C.F.R. § 404.1505(a).

Plaintiff's medical record is vast, dating back to January 2000 (Docket No. 10, p. 680 of 931). Plaintiff was admitted to several hospitals on numerous occasions for issues associated with his diabetes and leg pain (Docket No. 10, pp. 680-717 of 931). The mention of Plaintiff's alleged visual impairment in the record is minimal, at best. Although glaucoma was *suspected* by Dr. Vendeland in 2005 (Docket No. 10, p. 359 of 931), a more recent exam and evaluation revealed that Plaintiff did not, in fact, suffer from this disease (Docket No. 10, p. 741 of 931). Even Dr. Vendeland's report indicated that Plaintiff's vision impairment could be corrected (Docket No. 10, p. 359 of 931).

Additionally, Dr. Vendeland's evaluation is dated December 9, 2005, three and a half years before Plaintiff's amended alleged disability onset date of June 11, 2009 (Docket No. 10, p. 359 of 931). Plaintiff admits that this report pre-dates the amended onset date but argues that the "ALJ still has a duty to evaluate this evidence, particularly because there is clearly no evidence of medical

21

improvement with respect to the vision" (Docket No. 14, p. 8 of 11). This is not true. While Dr. Vendeland opined that Plaintiff likely suffered from glaucoma in 2005, a 2009 exam and evaluation definitively ruled out glaucoma as a diagnosis (Docket No. 10, p. 741 of 931).

Plaintiff also alleges that the ALJ "blatantly ignore[d]" Dr. Vendeland's opinion (Docket No. 14, p. 7 of 11). Again, this is not exactly true. In her decision, ALJ Kleber stated that there was "some evidence of a vision impairment, which may be related to Mr. Vaughan's uncontrolled diabetes" (Docket No. 10, p. 16 of 931). Plaintiff asserts that the ALJ was required to discuss Dr. Vendeland's opinion because it was part of the record (Docket No. 14, p. 7 of 11). As stated above, as long as the ALJ properly considered Dr. Vendeland's medical opinion in rendering her decision, she was not required to directly address the opinion in her final decision. *Loral*, 200 F.3d at 453.

It is clear from her decision that ALJ Kleber chose to reject Dr. Vendeland's opinion. Plaintiff alleges that "substantial evidence demonstrates Plaintiff suffers from a 'severe' visual impairment" (Docket No. 14, p. 7 of 11). However, ALJ Kleber properly noted that Plaintiff's "vision is correctable with ordinary glasses" (Docket No. 10, p. 16 of 931). Plaintiff even admitted in his testimony that he needs glasses but has not made an effort to obtain them (Docket No. 10, p. 43 of 931). Given the more time-relevant opinion of Dr. Prokopius, the results of Plaintiff's Physical Residual Functional Capacity Assessments, and the lack of objective medical evidence concerning Plaintiff's alleged visual issues, ALJ Kleber was reasonable in her assessment of Plaintiff's *severe* impairments. Plaintiff's first claim is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

3.    ASSESSMENT OF RESIDUAL FUNCTIONAL CAPACITY AND MEDICAL SOURCE STATEMENTS

Plaintiff also alleges the ALJ erred by failing to explain the weight given to certain opinions of record, specifically the ALJ's alleged failure to address the 2009 opinion of Dr. Paras (Docket No. 14, pp. 8-9 of 11). Defendant counters that the ALJ properly considered all of the opinion evidence and made a reasonable conclusion based upon the objective medical evidence (Docket No. 17, p. 6 of 10).

First and foremost, Plaintiff seems to allege that ALJ Kleber was somehow required to accept Dr. Paras' finding limiting Plaintiff to "light work" (Docket No. 14, pp. 8-9 of 11). The ALJ had no such duty. Even though an ALJ has the obligation to *take into consideration* all medical evidence before rendering a final opinion on benefits, it is the ALJ that is responsible for determining a claimant's residual functional capacity when cases are decided at an administrative hearing. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities - what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Therefore, an ALJ is not bound by the opinions of a claimant's physicians, treating or consultative, with regard to what the claimant can or cannot do. Furthermore, under SSR 96-5p, an ALJ "must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of the [Social Security Administration's] definitions of these terms." 1996 SSR LEXIS 2 at * 13. Therefore, despite what Plaintiff would have this Court believe, Dr. Paras' finding of "light work" is not dispositive in this case.

Second, Plaintiff alleges that this matter should, at the very least, be remanded, given that the ALJ, by failing to specifically include the weight given to Dr. Paras' opinion and the reasons for discounting that opinion, failed to base her decision on the valid medical evidence (Docket No. 14, p. 9 of 11). While this Court acknowledges that ALJ Kleber did not specifically state either the weight

23

given to Dr. Paras' opinion or the reasons for rejecting the opinion, her decision still satisfies all relevant requirements. Therefore, remand is not necessary.

Social Security regulations set forth two distinct types of assessments often used in determining what a particular claimant can still do despite his severe impairment(s). The first, as stated and defined above, is a residual functional capacity assessment. The second is a Medical Source Statement ("MSS"), defined as a "medical opinion[] submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." 1996 SSR LEXIS 2 at *11.

Here, Dr. Paras issued a MSS following a one-time disability examination of Plaintiff (Docket No. 10, pp. 603-04 of 931). In this statement, Dr. Paras concluded that Plaintiff's "ability to perform work-related physical activities is limited . . . by his symptoms of peripheral neuropathy, gastroesophagael reflux disorder, and pain in the left knee," and, as such, Plaintiff should be limited to "light work" (Docket No. 10, p. 609 of 931).

With regard to Dr. Paras' opinion, ALJ Kleber stated

[Dr.] Paras examined Mr. Vaughan at the request of the Disability Determination Services (DDS) on August 28, 2009. Dr. Paras noted that distal pulses were reduced to about 2+ bilaterally. There was also diminished vision in both eyes without correction. Crepitus was noted on the left knee with pain upon range of motion. There was also limited flexion in the left knee. The remainder of the physical examination was normal. Dr. Paras concluded that Mr. Vaughan's ability to perform basic work-related functions is limited by diabetes and symptoms of peripheral neuropathy, history of gastroesophageal reflux disorder (GERD), and pain in the left knee due to remote fracture.

(Docket No. 10, p. 14 of 931) (internal citations omitted).

Although ALJ Kleber did not state "here are my reasons for discounting Dr. Paras' opinion," she did give, to use Plaintiff's terms, "specific and legitimate" reasons based on substantial evidence

24

for finding Plaintiff capable of medium work. As Plaintiff fails to point out, ALJ Kleber did not deny the fact that Plaintiff suffers from diabetes and related complications that result in some limitations. The ALJ acknowledged that there is no question that Plaintiff suffers from diabetes. Plaintiff's medical records are replete with multiple visits to hospitals and doctors over an eleven-year period, a majority of which concern his diabetes diagnosis and treatment (Docket No. 10, pp. 312-931 of 931). Plaintiff's own testimony suggests that he is severely limited not only by the diabetes itself, but also by the corresponding issues associated with the diabetes. For example, Plaintiff indicated he can only stand for one to two minutes before needing to move around and that he can only go up and down stairs if he goes slow (Docket No. 10, p. 37 of 931). Plaintiff stated that he does nothing in terms of household chores and has to sit down to shower and shave (Docket No. 10, pp. 41-44 of 931). Plaintiff also initially stated that he has had to use a cane to maintain balance in case his legs give out everyday for the past three years (Docket No. 10, pp. 38-39 of 931).

However, ALJ Kleber noted that Plaintiff's medical records *also* indicate some level of non-compliance with treatment (Docket No. 10, pp. 317, 474, 724, 728 of 931). Plaintiff himself admitted this non-compliance during his testimony, stating that he forgets to take doses of his insulin at least a couple of times per week and, on some occasions, "improvises" with the medication doses (Docket No. 10, pp. 48, 55 of 931). Plaintiff also changed his initial testimony regarding the use of a cane. When asked by the ALJ if he was using the cane the last time he fell, Plaintiff responded that he was not and eventually admitted that he has only used the cane "on and off" for the past three years (Docket No. 10, p. 40 of 931).

By definition, "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Aside from

25

Plaintiff's own testimony, which the ALJ found to be "not fully credible" (Docket No. 10, p. 18 of 931), the only evidence that suggests that Plaintiff is incapable of medium work is Dr. Paras' 2009 report (Docket No. 10, p. 608 of 931). In fact, both of Plaintiff's Physical Residual Functional Capacity Assessments, including Dr. Das' 2006 evaluation, which Plaintiff argues the ALJ failed to even mention in her decision, indicate that Plaintiff had no postural, manipulative, communicative, environmental, or visual limitations (Docket No. 10, pp. 593-95, 647-49 of 931). Both Assessments reported that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; (4) sit with normal breaks for a total of six hours in an eight-hour workday; and (5) engage in unlimited pushing/pulling (Docket No. 10, pp. 592, 646 of 931). There is nothing in the record that suggests Plaintiff is not capable of this level of work. Furthermore, Plaintiff himself does not set forth any facts, other than Dr. Paras' evaluation and conclusion, to suggest that Plaintiff is further limited (Docket No. 14). As stated above, as long as the ALJ properly considered Dr. Paras' medical opinion, she was not required to directly address the opinion in her final decision. *Loral*, 200 F.3d at 453. The ALJ's evaluation of the objective medical evidence successfully refutes Dr. Paras' recommendation of light work. Therefore, Plaintiff's second argument is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

Finally, even if ALJ Kleber failed to properly note and weigh the opinions of Drs. Paras and Das, such error is harmless. Courts "are not required to convert judicial review of agency action into a ping-pong game where remand would be an idle and useless formality." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (*citing NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)). Even though ALJ Kleber may have failed to include the opinion of Dr. Das and specifically

26

include the reasons for discounting Dr. Paras' opinion, her decision contains sufficient reasoning such that those conclusions may be implied. Therefore, the Magistrate finds that any error committed by the ALJ in her decision is harmless and recommends the ALJ's opinion be affirmed.

## VIII. Conclusion

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 7, 2013

## IX. Notice

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has

27

been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.